## BYRNES v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5999.

Circuit Court of Appeals, Third Circuit.

Feb. 3, 1937.

THOMPSON, Circuit Judge, dissenting.

Simon T. Patterson and Thomas Watson, both of Pittsburgh, Pa. (Patterson, Goehring, McClintock & Collin, of Pittsburgh, Pa., of counsel), for petitioner.

Robert H. Jackson, Asst. Atty. Gen. and J. Louis Monarch and Joseph M. Jones, Sp. Assts. to the Atty. Gen., for respondent.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

This case concerns the proper persons to pay income tax under a patent trust agreement. The facts are undisputed and no fraud or attempt to escape taxation is involved. The amount of the income is not in question. Tax on the income was reported and paid by Mrs. Byrnes and her daughter, who received the income. The government contends the tax is chargeable to the husband and father, who never received the income, but, owing to the size of such husband and father's other income, his tax will fall under a higher bracket than if paid, as it was, by the wife and daughter. With this preliminary statement, we turn to the facts of the case.

One Joseph H. James was granted some forty patents which concerned the same general subject matter, and he and Byrnes, who was a patent lawyer of ability, entered into an agreement with a trustee for the exploitation thereof. The agreement was a triple one, viz., James, individually, who was the owner of 15 per cent. of the patents; Byrnes, individually, who was the owner of 85 per cent.; and a trustee, Byrnes, who as trustee was in point of fact and right a third party so far as James and Byrnes individually were concerned. In construing this trust agreement, we regard the trustee, though such trustee happened to be Byrnes, as in truth and fact a third party, and as if a trust company had been the trustee named. Accordingly, when we hereafter use the word "trustee," we mean the third party to the trust agreement, and, when we use the names "James" and "Byrnes," we mean James individually and Byrnes individually.

Now, turning to the trust agreement, which was signed by James, Byrnes, and the trustee, we find the purpose of the agreement was: "And whereas, it is desired to vest in said Clarence P. Byrnes, *as trustee, for the benefit of said parties,* the entire right, title and interest in and to any patents granted in the United States and any and all foreign countries upon all inventions of said James relating to said partial combustion methods, and render it *impossible for either of said parties or any one claiming* under them or under either of them to *make, use or sell* said inventions or any of them, or empower others so to do, without an *instrument in writing first executed by the Trustee."*

Accordingly, as stated therein: "Now therefore, in consideration of the premises and the sum of one dollar ($1.00) to them in hand paid by the said Clarence P. Byrnes, Trustee, the receipt of which is hereby acknowledged, the said Joseph Hidy James and Clarence P. Byrnes have sold and assigned, and by these presents do hereby sell and assign unto the said Clarence P. Byrnes, his executors, administrators and assigns, *as Trustee,* the entire right, title and interest in and to all said inventions, relating to partial combustion and in and to any other patent application or patents upon partial combustion methods, which may be applied for or granted upon any of the said inventions of the said Joseph Hidy James both in the United States and all foreign countries; in trust nevertheless for the said Joseph Hidy James and Clarence P. Byrnes and upon the following conditions to which the said *Trustee does hereby consent* and to the faithful performance of which he now binds himself."

Without reciting in detail the duties imposed on and accepted by the trustee, it suffices to say that in general the trustee was to exploit the patents, develop the business, and was given the power to grant licenses and to "have the power to assign and encumber the said inventions and patents and patent applications," and that, following "the testing of the first partial sized unit and the first full sized unit," James shall "receive fifteen per cent. (15%) of all net profits received upon the said inventions, whether arising from royalties, licenses, sale or other increments coming to the Trustee as the proceeds of said inventions, and fifteen per cent. (15%) of all stock, bonds, payments or other consideration received at any time or from time to time by the said trustee for the said in-

vention from any company, or companies, which may be organized by the Trustee or which may otherwise contract with the Trustee for the exploitation of said invention, and nothing shall be done by the Trustee to reduce or affect said fifteen per cent. (15%) interest of the said James in the net return of said inventions."

From this it will be seen that, subject to the terms of the trust, the title and ownership of the patents was in the trustee and that James, to the extent of 15 per cent., and Byrnes, to the extent of 85 per cent., were the sole beneficiaries of "all net profits received upon said inventions, whether arising from royalties, licenses, sale, or other increments coming to the Trustee as the proceeds of said inventions."

It will thus be seen that the situation was not the ordinary one of the owner of a patent assigning a part of prospective royalties to another and thus conferring a right on the assignee to collect such assigned part of the royalty. Here the patents themselves were assigned to a trustee; . that trustee had broad powers; he was the exclusive receiver of license royalties; he was to segregate money for the protection of the patents in litigation; and, as quoted above, James was to receive his 15 per cent. of "net profits received on said inventions," including "royalties, licenses, sale, or other increments" and of "stock, bonds, payments or other consideration received at any time or from time to time by said trustee."

After some five years' exploitation, a license agreement involving six of the patents was made with Alfred G. Kay, by which royalties were to be paid to the trustee, which was done.

By 1927 the success of the venture was such that Byrnes desired his wife and daughter should share therein, and by writings of October 31, 1927, which we now consider, he provided for them in terms about which this case centers. It is here to be noted that Mr. Byrnes was an experienced patent lawyer and fitted to understand and use, in the light of patent law, the words employed. He knew the property rights vested in the trustee by the original trust agreement, and he also knew what property rights were, under said agreement, held individually by him, to the extent of 85 per cent., and by James, to the extent of 15 per cent.

■ Turning to the assignment made to the wife—that to the trustee of his daughter is of like import—we note that an assignment to a wife is permissible in Pennsylvania.

■ The instrument is as follows:

"Know all men by these presents, that I, C. P. Byrnes, of Sewickley, in the County of Allegheny and State of Pennsylvania, have this day sold, assigned, transferred and set over, and by these presents do sell, assign, transfer and set over unto my beloved wife Mary B. Byrnes, in consideration of the payment of the sum of One ($1.00) Dollar paid to me by said Mary B. Byrnes, and in further consideration of my love and affection for her, an undivided one-third (⅓rd) interest in and to all returns and revenues which I now am or hereafter may be personally entitled to by reason of my individual ownership of eighty-five (85) per centum of the inventions of Joseph H. James, now Professor of Chemistry in the Carnegie Institute of Technology, in the City of Pittsburgh, Pennsylvania, relating to partial oxidation of mineral oils, which said inventions have been assigned to me as Trustee and are now held by me as Trustee, and which said inventions are in part disclosed and claimed in certain patents and certain pending applications for patents in accordance with a list thereof, hereto attached, made part hereof and marked Exhibit 'A'."

It will be noted that the assignment is by Byrnes individually and that the trustee has no part in such instrument. It will also be seen that it does not purport to assign any patent or any royalty, for Byrnes, individually, could not assign the patents trustee held, nor could he assign the royalties payable by Kay on six of the patents, for those royalties were payable to and collectible by the trustee, and him alone. And the assignment did not so assign. On the contrary, it assigned to her one-third of his share in the agreement in these words, "an undivided one-third (⅓) interest in and to all *returns and revenues* which I am or hereafter may be *personally* entitled to by reason of my *individual* ownership of eighty-five (85) per centum of the inventions of Joseph H. James, etc." (Italics ours.) This was in accord with the original agreement, for, as we have seen, neither he nor James could individually sell the patents, because the trust

agreement renders "it impossible for either of said parties, or any one claiming under them or under either of them, to make, use or sell said inventions or any of them"; nor did he have any right to collect royalties, but, as we have seen, his right, as was that of James, was to receive 85 per cent. "of· all net profits" and an equal per centum "of all stocks, bonds," etc. But, while Byrnes and James individually could not collect the royalties, could not license under the patents or sell them, they were beneficiaries under the trust and the trustee held the patents under the trust. It is clear, therefore, that this beneficial interest was property and that under the inclusive phrase, "all returns and revenues," it could be conveyed. So far as one-third of the 85 per cent. interest of Byrnes individually was concerned, he assigned it in toto to his wife and thereafter had no ownership thereof.

■ During the tax year in question, and indeed at no time, had he collected any royalties or received any income therefrom. They were received by the trustee and, in pursuance of the trust, trustee had paid them to Mrs. Byrnes and not to her husband. She having received such "net profits" from trustee and paid the income tax thereon, it follows, therefore, that the Board of Tax Appeals had no right to charge Byrnes with an income tax on income he never received. We cannot agree with the statement of the Tax Board, which held: "The petitioner did not divest himself, either in‹ terms or by legal construction, of his interest in the trust which held the patents, but only of the returns and revenues thereof. However subtle the distinction may be, it has been often enough recognized in prior decisions to require a similar recognition here," but rather bottom our decision on the reasoning of the Supreme Court in Irwin v. Gavit, 268 U.S. 161, 45 S.Ct. 475, 476, 69 L.Ed. 897, where, treating of a bequest, it is said: "The courts below went on the ground that the gift to the plaintiff was a bequest and carried no interest in the corpus of the fund. We do not regard those considerations as conclusive, as we have said, but if it were material a gift of the income of a fund ordinarily is treated by equity as creating an interest in the fund. Apart from technicalities we can perceive no distinction relevant to the question before us between a gift of the fund for life and a gift of the income from it. The fund is

appropriated to the production of the same result whichever form the gift takes."

So holding, the order of the Board is vacated.

THOMPSON, Circuit Judge (dissenting).

I am constrained to dissent in view of the decisions and reasoning in Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, and Burnet v. Leininger, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665, which hold that income is taxable to the owner of the property rights giving rise to the income, even though there may have been a prior assignment designed to divert the income, when accrued, into the hands of another.